

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-10-022-CV**

IN THE INTEREST OF N.A.,
L.M.A., AND J.A., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant M.A. (Mother) appeals the termination of her parental rights to her children, N.A., L.M.A., and J.A. In two issues, she contends that the evidence is legally and factually insufficient to show that termination is in the children's best interests. Because we hold that the evidence is legally sufficient but factually insufficient, we reverse and remand for a new trial.

---

[1]*See* Tex. R. App. P. 47.4.

## Background Facts

Mother was born in Mexico. She illegally came alone to the United States in 1999 when she was fifteen years old and was five months pregnant because she did not want to burden her parents with her pregnancy. She now has four children: N.A., who was born in June 2000; L.M.A., who was born in July 2001; J.A., who was born in June 2003, and N.C.A., who was born in September 2006.[2] Mother conceived her first three children with D.V., who she had not seen for almost seven years at the time of the trial.[3]

Child Protective Services (CPS) first investigated Mother when she was living in El Paso in 2004.[4] N.A., who was four years old at that time, had an asthma attack.[5] Mother was at work, and her cell phone's battery was exhausted. Thus, N.A.'s babysitter called an ambulance to take N.A. to a hospital. According to Mother, she left asthma medicine for N.A. in a diaper bag, but the babysitter did not notice it. Mother went to the hospital, and CPS closed its case that day.

---

[2]Mother's parental rights concerning N.C.A. are not subject to this appeal.

[3]The trial court terminated D.V.'s parental rights to the children based on constructive abandonment.

[4]CPS is a division of the Texas Department of Family and Protective Services (the Department). *See In re E.A.K.*, 192 S.W.3d 133, 137 n.1 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

[5]Asthma is a chronic, sometimes deadly disease that causes the inability to expel air. N.A. developed asthma when she was six months old.

Then, in 2006, while Mother was living in Fort Worth, CPS became involved with Mother when N.A. had an asthma attack at school, and although Mother had given the school medication for N.A., the school could not contact her. CPS released Mother's children to her at the hospital.

In February 2008, N.A. again had difficulty breathing while she was at school, and she did not have medication to help her. CPS learned of the incident but did not remove the children from Mother's home.

In May 2008, Mother became involved with CPS yet again when the police found marijuana in Mother's home while the children were there and Mother was at work. Mother testified that the marijuana did not belong to her and that she has never used marijuana or other drugs. She said that her brother was responsible for the children on the date that the police found the marijuana.[6] B.C., who is Mother's ex-boyfriend and N.C.A.'s father, began caring for the children even though Mother told CPS that B.C. had a drinking problem and had used drugs.[7] B.C. would not let Mother see the children.

In late June 2008, N.A. had another asthma attack and went to Cook Children's Hospital. While she was there, B.C. had a car accident while Mother's

---

[6]The police apparently came to Mother's home because of a fight in which Mother's doors, televisions, and sofas were broken, although the record does not provide many details about the fight. CPS does not have a concern about whether Mother ever used drugs.

[7]Mother lived with B.C. from 2003 through 2007; she was separated from him for about a year before CPS's involvement in this case.

other children were with him. B.C. then left L.M.A. and J.A. at the hospital but kept N.C.A., his and Mother's only shared biological child, with him.[8] Mother received a call from her cousin about N.A.'s condition and went to the hospital.

Mother initially said that she was with N.A. at the hospital "permanently." However, she then admitted that on one occasion, she left the hospital for several hours without notifying hospital staff; she said that she went to pick up a vehicle so that she could drive the children back to her home. While Mother was at the hospital, she was told to watch a film about asthma but never did so because, according to her, someone "did not permit [her] to stay in the hospital."

At the beginning of July 2008, the Department placed the children with a foster family and filed a petition that asked the trial court to terminate Mother's parental rights if her reunification with the children could not be achieved. The Department attached affidavits to the petition that detailed Mother's alleged neglect of N.A's asthma problem and Mother's leaving the hospital while N.A. remained there. One of the affidavits, signed by Dr. Kevin Wylie, who cared for N.A. at the hospital, said that N.A. was in danger if she did not have asthma medication. The trial court signed an order giving the Department temporary sole managing conservatorship of the children.

Later in July 2008, Mother was arrested for fraudulently destroying, removing, or concealing a writing; on August 1, 2008, a trial court convicted her

---

[8]B.C. eventually took N.C.A. and disappeared; Mother believes that N.C.A. is in Albuquerque.

of that offense and sentenced her to ten days' confinement in jail.[9] Based upon her status as an illegal immigrant, she was deported to Mexico, and she called CPS frequently to check on the status of the children.

In August 2008, the Department filed a service plan. The plan described some of the children's needs; gave Mother several goals, such as understanding N.A.'s special needs, showing the ability to protect her children, maintaining safe housing, and following medical advice; and listed many specific tasks for Mother to complete, such as maintaining contact with her CPS caseworker, participating in a psychological evaluation and a parenting class, maintaining employment, and participating in individual counseling.

Mother remained in Mexico until November 2008, when she illegally reentered the United States. When she returned to Fort Worth, Mother met with Vicky Garza, who became Mother's CPS caseworker in July 2008. Garza gave Mother a visitation schedule and a copy of the service plan, which CPS translated into Spanish. Mother began to work on her service plan; she had a psychological evaluation, completed a drug and alcohol assessment, and found a job and an apartment.

---

[9]*See* Tex. Penal Code Ann. § 32.47 (Vernon 2003) ("A person commits an offense if, with intent to defraud or harm another, he destroys, removes, conceals . . . or otherwise impairs . . . a writing, other than a governmental record."). Specifically, Mother pled guilty to changing a tag on an item at Wal-Mart even though she said that her friend did it. Mother said that she pled guilty because she "did not want to fight something that was only 10 days" and she "knew that the Department of Immigration was waiting for [her]."

In March 2009, Mother was arrested for failing to identify herself to a police officer; she eventually pled guilty, was convicted, and received a twenty-day jail sentence. Nonetheless, Mother was making significant progress on her service plan. By May 2009, the Department planned to eventually return the children to her care; thus, Mother filed a motion requesting a 180-day extension of the statutory dismissal date,[10] and the trial court granted the motion. Also in May 2009, the trial court entered an order that listed nine conditions necessary for the return of the children to Mother, including that she participate in individual counseling and in a program addressing N.A.'s medical concerns.

Mother received individual counseling at Positive Influences a few times in April and May 2009, and she anticipated her children's return. In June 2009, Garza visited Mother's home, which was clean and was stocked with food.

However, in the middle of July 2009, the police arrested Mother (along with Mother's brother, Jorge Garcia, and another person) for aggravated robbery, and the next month, a Tarrant County grand jury indicted her with the same charge.[11] Because Mother could not post a $50,000 bond, she continued to stay in jail from the time of her arrest until the trial of this case, which began in November 2009.

---

[10]*See* Tex. Fam. Code Ann. § 263.401 (Vernon 2008).

[11]The indictment alleges that Mother used or exhibited a deadly weapon. Aggravated robbery is a first-degree felony that carries a maximum punishment of life in prison. *See* Tex. Penal Code Ann. § 12.32(a) (Vernon Supp. 2010), § 29.03(b) (Vernon 2003). We will provide more details about Mother's aggravated robbery charge in our analysis of her issues.

The trial court terminated Mother's parental rights to her children, finding that termination is in the children's best interests and that Mother (1) knowingly placed or knowingly allowed them to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed them with others who engaged in conduct that endangered their physical or emotional well-being, and (3) failed to comply with the provisions of a court order that specifically established actions necessary for her to obtain their return.[12]  Mother filed her notice of appeal.

**The Termination of Mother's Parental Rights**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the

_____

[12]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (Vernon Supp. 2010).

7

child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the

8

finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In our factual sufficiency analysis, we must view the evidence in a neutral light. *In re J.N.*, 301 S.W.3d 429, 431–32 (Tex. App.—Amarillo 2009, pet. denied); *In re T.N.F.*, 205 S.W.3d 625, 630 (Tex. App.—Waco 2006, pet. denied); *Hampton v. Tex. Dep't of Protective and Regulatory Servs.*, 138 S.W.3d 564, 566–67 (Tex. App.—El Paso 2004, no pet.). However, we must give due deference to the factfinder's findings and not supplant its decision with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the findings necessary for termination. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

9

There is a strong presumption that keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). Nonexclusive factors that a factfinder may use in determining the best interest of the child include the desires of the child; the emotional and physical needs of the child and danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

**The children's desires**

Although the children did not testify, the evidence indicates that they want to continue to have a relationship with Mother.  For example, Garza (Mother's caseworker) testified that at the time of the trial, the children were in counseling to address "the issues of possibly not being able to go back to [Mother]."  Also, Mother testified that the children loved her very much and were suffering because they were not with her.

**The acts or omissions of Mother that affect the propriety of her relationship with the children, her excuses for those acts or omissions, and the potential for danger to the children now and in the future**

**The aggravated robbery charge and Mother's other criminal behavior**

As described above, in August 2008, Mother pled guilty to destruction, concealment, or removal of a price tag at Wal-Mart, a misdemeanor; a court convicted her and sentenced her to ten days' confinement. After being deported, Mother broke the law to return to the United States "because of love for [her] children."[13] Mother was also convicted in April 2009 for failing to correctly identify herself to a police officer, a misdemeanor.

At the time of the trial, Mother's aggravated robbery case, a felony, was unresolved. When Mother was asked to explain the circumstances leading to that charge, she said that she had attended a party, and when the party ended, Augustine Garcia accompanied her to her car because Garcia wanted her telephone number. Then, according to Mother,

> a boy came to me whose name is Edmundo Flores[,] who on occasions had tried to have a relationship with me, but in all reality, I never did consider him as a person for me to have a relationship with, and I never had a relationship with him.
>
> . . . .
>
> . . . I was speaking with [Garcia,] who is the victim on this case, and . . . Edmundo Flores arrived -- and he started to discuss with me and also with that other gentleman.[14] They started to fight.

---

[13]An illegal alien who has been deported and thereafter reenters the United States may be "imprisoned not more than 2 years." 8 U.S.C. § 1326(a) (2005).

[14]Mother said that Flores was asking her why she did not love him.

11

Afterwards, they also broke a window from my vehicle. Edmundo Flores had a pistol with him.[15] I left that place because I did not want any problems. Afterward, a detective went to speak with me about that case. I did not lie to that detective. I told him that I did see the pistol and that I was at that place, but I never did see any robbery, but he placed an order of arrest on me because I never called the department of police to give them that information . . . .

Mother said that before the incident in question, she had known Flores for about four years. Mother denied that she took Garcia's wallet during the altercation and said that she "imagine[d] it was Edmundo [who took the wallet] because it was a robbery." But then, after Mother was asked whether Garcia's credit card had been used at Wal-Mart, she said,

> [A]bout 30 minutes afterwards, Edmundo arrived to my house, and I was -- he said that I was acting like that because I was jealous . . . . And I repeatedly again told him what I had told him before, and he told me, well, what do you need? I told him, I have to pay rent, I have to buy food, I have to supply my own needs with shampoo and soap and to wash the clothes, and then I told him my children are about to go into school and possibly my children are going to be returned to me, and I must supply them what they need: The uniforms, the bags, everything that they need. . . . He told me, I have money. Why don't we go so that you can get what you need for yourself and your children? . . . And I said okay. . . .
>
> There was no problem. It was just one payment, and he paid it all. I returned to my home. Afterwards, the next day, he returned back to my house and I decided, okay, it's all right, let's go ahead and start going out like to eat or to go to the movies or something, and in that process, then, the detectives arrived and asked me, started asking me about him.

---

[15]Mother explained that Flores pointed the pistol at her. Mother said that her brother, Jorge, was also involved in the incident; he hit Garcia.

Mother admitted that Flores used Garcia's credit card to buy her things, but she said that she did not know that it was Garcia's card at the time and that she is "not that stupid."

Garza opined that Mother has a continuing course of criminal conduct. The record implies that Mother might commit more crimes; Mother said that if she is deported again, she will try to return to the United States illegally so that she can "continue fighting for [her] children."

**Mother's compliance with the service plan**

Mother finished almost all of her service plan. She complied with the plan by maintaining contact with CPS, completing a psychological evaluation with Dr. Nichelle Wiggins, participating in a drug and alcohol assessment, passing random drug tests, completing parenting classes, and maintaining employment (until her latest arrest). However, she did not participate in a program to address CPS's medical concerns about N.A. (by watching a video),[16] did not complete her counseling at Positive Influences, and did not attend her every-other-week visits with the children at the CPS office once she was in custody.

Mother said that she struggled with the Positive Influences classes because the counselor did not speak Spanish but that she had planned to return

---

[16]The service plan stated, "Should the children be returned to [Mother], she will participate in a program that will address the medical concerns of [N.A.]." The children were never returned to Mother.

to the classes before she was arrested. She was discharged from Positive Influences because of nonattendance.

The asthma video was offered in Spanish, and Garza said that she gave Mother a telephone number so that she could schedule a time to watch it. Mother said that Garza never asked her to watch the video and did not provide her with any information about watching the video.

### N.A.'s asthma and Dr. Wylie's testimony

Dr. Wylie, who is a pediatrician at Cook Children's Hospital, explained that when he saw N.A., her asthma was worsening and that there "was a sense during her hospitalization that her home environment was chaotic, which raises concerns over appropriate attention to and care for her asthma." Dr. Wylie was concerned about N.A.'s previous trips to hospitals when she was not properly medicated. He explained that N.A. had missed three visits with a pulmonologist and had not taken medication for a day because a machine was not working. Dr. Wylie said that he had concerns about N.A.'s care "in view of the fact that she had missed appointments with pulmonologists. A machine can break, but when that happens, generally you present sooner rather than later, so my worry is that there was insufficient recognition that [N.A.] had a life-threatening . . . illness." Dr. Wylie opined that one of N.A.'s asthma attacks could kill her.

Mother's counsel asked Dr. Wylie, "What is a parent . . . supposed to do when they see that [a] child is having an asthma attack?" Dr. Wylie answered by saying in part, "you treat into a point where it looks like you need more

14

aggressive care and then you either call the doctor or you head immediately to the emergency department." Dr. Wylie said that with proper training, someone could recognize the triggers of an asthma attack and help manage N.A.'s asthma. But he said that he would be "reluctant to have someone caring for a child with asthma that did not have the appropriate education."

Although Mother did not watch the asthma video that CPS recommended for her, she testified that she has researched asthma, that she has taken an asthma-related class, and that she has watched several other videos about the disease. Mother knows to give N.A. her treatments three times per day and to give her further treatments every four hours if N.A. has an asthma attack. Mother helped N.A. receive treatments in the past by bringing her to Texas because Mother was unsatisfied with the treatments that N.A. was receiving in Mexico.

Mother said that she is aware of how serious N.A.'s asthma problem is. Mother has different types of medicine to give to N.A. and also has a nebulizer for N.A. to use. Mother said that if N.A. had another asthma attack, Mother would immediately take her to the hospital. Regarding N.A.'s previous asthma attacks, Garza said that a parent should make sure that a babysitter knows where asthma medication is located and that a school has appropriate asthma medication available for the child.

15

**The emotional and physical needs of the children, the stability of the home or proposed placement, and the plans for the children by Mother and the Department**

### The status of the children at the time of the trial

The children were in the same foster home throughout the trial court's proceedings. J.A. is "very bright," is doing well in school, and loves to play with computers. L.M.A., who was in the third grade at the time of the trial, was taking speech classes because she had a hard time formulating words, but her speech was getting better. N.A., Mother's oldest child, acted like a second mother to the other children, so for a while, she had a power struggle with her foster mom and was seeing a psychiatrist. But of the three children, N.A.'s behavior had progressed the most, and she was "beginning to blossom academically."

### The plans for the children

Mother believes that the children's best interest is to remain together and receive the "love that [she] can give them" or be with relatives that can give them that love. To that end, Mother said that while she was waiting in jail until her aggravated robbery case was resolved, her family members, of whom she gave names and telephone numbers to Garza, were interested in caring for the children and were financially able to do so. Mother said that the family members had not had very much contact with the children, and she indicated that she only gave Garza the names and numbers of the family members, who live in El Paso

and Fort Worth, on the first day of trial.[17]  Mother acknowledged that CPS has a policy of not placing children with strangers, and she conceded that none of her family members contacted CPS about taking the children or visited the children while they were in foster care.

Mother also said that two acquaintances from a church could watch the children pending the resolution of her aggravated robbery case:  Betty, who has a "very difficult last name" and who Mother conceded that she has not known for long, and Andrea Rodriguez, who knew the children only from seeing them at the church but has visited Mother in jail.  Garza said that she had not attempted to complete a home study for Rodriguez and had not run a criminal history check on her.  Rodriguez was interested in keeping the children only temporarily "until [Mother] gets out of jail."  Garza talked to Rodriguez, but Garza explained that Rodriguez did not have a relationship with the children.

Mother asked the trial court to place the children in foster care or with one of the people that she had recommended until her aggravated robbery case was resolved and then release the children to her if she got out of jail.  However, Mother conceded that it is not fair to the children to make them stay in foster care until that time.  She also admitted that the children need stability.  She conceded that she was at fault for being in jail.

---

[17]Mother also said at the trial that her family members in El Paso had only recently learned that the children were in foster care.

17

Garza said that the Department has made reasonable efforts to return the children to Mother. When Mother was deported, Garza contacted the Mexican Consulate a few times by telephone and e-mail about allowing the children to live with their relatives in Mexico, but according to Mother, the consulate "never did anything." Mother also went to the consulate twice and called the consulate a few times to try to place her children with a relative in Mexico, but Mother said that the consulate told her that Garza "needed to show more energy and be more constant in being informed."

Garza also testified that she had made several attempts to call people in Mexico whom Mother said could watch the children, including Mother's father, who died during CPS's case. Garza contacted Mother's great aunt and her sister-in-law, but both women said that they could not care for the children. Garza attempted to call B.C.'s mother about her possibly caring for the children, but the phone number that Mother gave for B.C.'s mother was not viable. Garza also spoke to some of the people whom Mother had recommended to take the children, but they said that they could not do so.

The children's foster parents do not want to adopt them. Garza said that she had twice put out a broadcast about the children in order to obtain home studies on individuals who could be interested in adopting them. Although Garza believes that the children are adoptable, she had not received a response to the broadcasts at the time of the trial.

Mother said that although she was in jail, she had about $700 to support the children. However, Mother admitted that she has not financially supported the children since they have been in foster care.

**Analysis**

We conclude that this evidence is legally sufficient to support termination. Specifically, we hold that, viewing the evidence in the light most favorable to the judgment and disregarding evidence contrary to the trial court's best interest finding unless a reasonable factfinder could not, the following evidence (among other facts) could have reasonably persuaded the trial court that termination of Mother's rights is in the children's best interests: (1) Mother had two convictions (one of which caused her deportation), had committed other crimes by illegally entering the United States, and was accused of aggravated robbery, which could result in a sentence of up to life in prison upon conviction; (2) N.A. had been hospitalized three times because of her asthma while in Mother's custody, and on two of those occasions, Mother could not immediately be contacted about N.A.'s condition; (3) Mother failed to complete counseling at Positive Influences, although she went to some of the classes; (4) the children were exposed to marijuana on one occasion when Mother's brother cared for the children; and (5) Mother was not in a position to provide significant physical, emotional, or financial support to the children at the time of the trial or in the immediate future. *See J.P.B.*, 180 S.W.3d at 573. Because we hold that the evidence is legally

19

sufficient to show that termination is in the children's best interests, we overrule Mother's first issue.

However, viewing the evidence in a neutral light, we hold that it is factually insufficient to support the trial court's best interest finding. Mother did not know when or whether the trial of her aggravated robbery case would occur. When Garza was asked whether the Department could retain managing conservatorship of the children rather than seeking termination of Mother's rights, she said, "That places a problem for them, because there is the possibility of being placed in different homes and not being able to stay with the foster home that they're at right now. That's just not -- that's not in their best interest." The Department's opinion seems to be that the trial court had only two options: (1) terminate Mother's rights in this case and irreversibly end her relationship with the children, or (2) grant the Department managing conservatorship and forever preclude the children's permanent placement through adoption (because Mother's parental rights would still be effective) even if Mother was convicted of aggravated robbery.[18] However, the law provides a third option; the trial court could have named the Department as the children's managing conservator,

_____

[18]At the trial, Garza explained her belief that if the Department obtained managing conservatorship of the children and Mother was convicted of aggravated robbery and received a substantial sentence, the children would be in foster care until they were eighteen years old. Similarly, the Department argues in its brief that the trial court's giving conservatorship to the Department but not terminating Mother's rights would "leave the children in a permanent state of uncertainty."

continued the children's placement with the foster family or moved them to live with one of the individuals suggested by Mother, and later readdressed either termination (if Mother was convicted of aggravated robbery) or reunification (if Mother was acquitted). *See* Tex. Fam. Code Ann. § 156.101 (Vernon Supp. 2010) (providing for modification of an order establishing conservatorship); § 161.004(a)(2) (Vernon 2008) (explaining that a court that previously denied termination of a parent's rights can terminate those rights through a new suit if circumstances related to the children or a parent have materially and substantially changed); *In re J.A.J.*, 243 S.W.3d 611, 617 (Tex. 2007); *In re C.T.E.*, 95 S.W.3d 462, 465 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Permanence and stability are important considerations for a child's present and future physical and emotional needs. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."). However, at the time of the trial, the Department had not found a family interested in adopting the children; thus, the trial court could not achieve immediate permanence or stability for them even by terminating Mother's rights.

When the Department's attorney asked Garza why she was requesting termination, she said,

> Well, due to the fact that she's been deported once and now she's in
> jail for a crime that ultimately could result in her having prison time

as well as being deported back to Mexico, and she has already had one deportation.

There is also the concern of the ongoing issue with the medical neglect on her part. She hasn't resolved that issue. We feel like it's in their best interest that, given that there is not any place for the children to go to while she takes care of her legal issues at this time, that termination is in the best interest of the children.

Garza later opined that deportation is not a ground for parental termination but said that it leaves children without placement. Garza believed that Mother had a "hold" for deportation, which Garza said would leave the children with no placement even if Mother got out of jail. But Mother said that if CPS released the children from foster care, they could live with her in Mexico at a two-bedroom house that she owns.

Although N.A. had been hospitalized in the past for her asthma while Mother had custody of her, she also had to be hospitalized once for three or four days because of an asthma attack that she had while in her foster parents' care.[19] Mother said that she had provided a babysitter with medication that might have prevented the 2004 hospitalization; her testimony in that regard was not contradicted. Mother also provided medicine to the school before N.A.'s 2006 hospitalization, although she did not do so before N.A.'s February 2008 hospital stay. As the Department acknowledges, N.A. was not in Mother's care at the time of N.A.'s June 2008 hospitalization.

---

[19]Garza said that Mother "has shown that she continues to place [N.A.] at risk with her medical issue." But Garza also acknowledged that the risks to N.A.'s health could occur while the Department had care of her.

Mother had not watched an asthma video that the Department had recommended for her, but she previously watched asthma videos and received asthma-related training. The Department did not remove the children from Mother's care from 2004 through February 2008 based on N.A.'s three asthma incidents occurring during that time, and the Department was planning on returning the children to Mother's care despite those incidents until Mother's arrest for aggravated robbery.

Although the Department argues that Mother has a "continued course of criminal conduct," it planned to return the children to her care after her first two convictions. Mother's most serious offense was not adjudicated at the time of the trial, and she provided an uncontradicted version of facts that, if believed, would show her innocence of that offense. The trial court could have been reasonably skeptical about Mother's explanation of the aggravated robbery because she admitted to going to Wal-Mart with the man (and later dating the man) whom she said had pointed a gun at her thirty minutes earlier. However, as discussed above, the trial court had the option to allow Mother's criminal case to resolve before terminating her rights. We cannot conclude that the children's best interests are served by having their relationship with Mother permanently severed based on alleged facts that a court or jury could later find to be

unproven.[20] *See In re A.S.*, 261 S.W.3d 76, 85 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("[A]s to [a father's] indictment on charges of aggravated robbery, although he was incarcerated while awaiting trial on that charge, there was no conviction at the time of the termination hearing and, thus, the length of imprisonment, if any, was speculative."); *In re S.R.L.*, 243 S.W.3d 232, 236 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ("That a parent is imprisoned does not automatically establish that termination of parental rights is in the child's best interest.").

Next, although the children were exposed to drugs on one occasion, the Department was not concerned about whether Mother ever used them. And although Mother did not complete Positive Influences, she testified that she was planning on doing so before her aggravated robbery arrest.

Finally, Mother took actions to achieve the return of the children before her aggravated robbery arrest. Even while she was in Mexico for several months, she called CPS frequently to check on the children, and when she returned, she completed most of her service plan and prepared a home for the children's return.

For all of these reasons, viewing these facts and the remaining evidence in a neutral light, we conclude that, under the relevant standards, the evidence is

---

[20]We do not hold that termination of a parent's rights is always unjustified when the parent has pending criminal charges at the time of the termination trial; we limit our holding to the particular facts in this case.

24

factually insufficient to defeat the strong presumption that maintaining the children's relationship with Mother is in their best interests. *See R.R.*, 209 S.W.3d at 116; *H.R.M.*, 209 S.W.3d at 108; *J.N.*, 301 S.W.3d at 431–32, 435; *C.T.E.*, 95 S.W.3d at 469. We sustain Mother's second issue.

## Conclusion

Having sustained Mother's second issue and having determined that the evidence is factually insufficient to support the trial court's termination of Mother's parental rights, we reverse the termination order and remand this case for a new trial. *See In re W.C.*, 98 S.W.3d 753, 755, 766 (Tex. App.—Fort Worth 2003, no pet.).

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

DELIVERED: September 30, 2010